UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN R. CAISSIE, LEE SMITH, and GREG BRYANT, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiffs<br><br>v.<br><br>BJ'S WHOLESALE CLUB, INC.,<br><br>Defendant. | Civ. No. 08-cv-30220 (MAP) |

**DECLARATION OF SETH R. LESSER IN
SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF CLASS AND COLLECTIVE ACTION SETTLEMENT, FOR AN
AWARD OF ATTORNEYS' FEES AND EXPENSES, AND FOR APPROVAL
<u>OF INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES</u>**

SETH R. LESSER, an attorney admitted to the bar of this Court *pro hac vice* for the present case, declares, under penalty of perjury that:

1.      I am a partner in Klafter Olsen & Lesser LLP, counsel for Plaintiffs Kevin R. Caissie, Greg Bryan and Lee Smith (together, "Class Representatives" or "named Plaintiffs"), in this action. I am fully familiar with the facts and circumstances set forth herein, and I make this Declaration in support of the Plaintiffs' motion for final approval of the class and collective action settlement, for an award of expenses and attorneys' fees and for approval of incentive awards to the named Plaintiffs.

2.      I submit this declaration in support of Plaintiffs' motion for final approval regarding an award of attorneys' fees, reimbursement of expense and in support of awards to each of the Class Representatives. The testimony set forth herein is based on

1

first-hand knowledge about which I would and could testify competently in open court if called upon to do so, and on contemporaneously-generated records kept in the ordinary course of law practice by my firm.

3.  Attached as Exhibit A hereto is the Affidavit of Lance Blair of the Garden City Group, Inc. ("GCG") appointed by the Court to be claims administrator in the Order Preliminarily Approving Settlement (Docket No. 25), which affidavit sets forth the notice that was effectuated pursuant to the Court's direction in the order preliminarily approving the settlement and the response of the collective action and class members.

4.  As set forth in Blair Affidavit, GCG fulfilled all the requirements of the notice ordered by the Court, and specifically ensured the mailing of the notice to all the 2,803 members of the two classes (referred to hereinafter in the singular as "class") through an initial mailing (as well as a corrective mailing), a remailing, a reminder notice, updating and resending of notices, the creation of a website (which has had 729 visits), the creation of a 1-800 telephone line (which provided information and had 544 calls, with 85 callers leaving messages), the establishment of a post office box for claims and correspondence, and also ensured compliance with the provisions of the federal Class Action Fairness Act, 28 U.S.C. § 1715.  *See* Blair Aff. ¶¶ 4-11, 16.  In addition, on June 17, 2010, GCG will send a reminder postcard to those class members who have not responded.

5.  As of June 9, 2010, GCG had received approximately 2,154 claim forms, which represents a claims rate of approximately 77%, and the value of the claims received as of that date was 86% of the monies available in the settlement fund for class members. Blair Aff. ¶ 13.

2

6. No objections (timely or untimely) were received to the Settlement. Blair Aff. ¶ 15.

7. Only a single (timely) opt-out from the Settlement was received. Blair Aff. ¶ 14; *see also* Blair Aff. Ex. F. This was from Glenn D. Rivera. Prior to sending in his opt-out form, I had been called by Mr. Rivera's attorney who explained that Mr. Rivera had his own claims against BJ's that he wished to preserve and that accordingly he would be opt-ing out. I responded that under the circumstances I understood.

8. In connection with the Settlement, GCG has informed me that it anticipates that its costs will, at the end through completion, total approximately $150,000 in fees and costs for the notice and the administration of the notice and claims, addressing deficiencies, handling tax withholding matters and responding to inquiries. These numbers and its estimate of the final total are, in my experience, reasonable and expected.

9. In addition to the class members who made inquiry of GCG, my office has had innumerable calls from class members from the time the settlement was first announced last year until this week. Although it is not clear why so many class members have called – possibly due to the robustness of the notice – the numbers have been somewhat relatively higher than we have had in other, similar wage and hour settlements. The calls range from questions that seek to pass on address changes or request remailings to more substantive matters such as how the amounts per class member were going to be determined or what class members should expect on a going forward basis. Perhaps the most common question has been when the money might be expected to be received. My staff and I have handled these calls. Without exception, I am pleased to be able to state

3

that the response of the class members has been positive.  Many class members with whom I personally spoke explained that family circumstances, such as job losses from the recession, have made the anticipated receipt of the settlement proceeds particularly valuable.

10. Notwithstanding the fact that this case resolved expeditiously through mediation without formal discovery or motion practice, the work undertaken by my firm during the course of this litigation was fairly extensive.  The procedural history of the litigation was set out in my declaration in support of preliminary approval and will not be repeated here.  All told, our time, both lawyers and legal assistants, has exceeded 600 hours (specifically, 654 hours), with more time expected, as is set forth below.  We conducted two sets of prefiling investigations (for the prior, parallel case we had filed on behalf of two BJ's Mid-Managers, and then this case), reviewed the information BJ's had provided to us in connection with our informal discovery requests prior to the mediation, and spoke to all of our clients both in the earlier and present cases to determine their actual job duties and responsibilities and the job duties and responsibilities of the various positions at issue.  Our investigation also included research into the claims and analysis of the actual duties and responsibilities of the employees who held the positions as issue and the manner in which BJ's had compensated employees who held the positions.  In addition we investigated and analyzed the applicable state and federal law as applied to the facts discovered with regard to the claims asserted and the potential defenses thereto. In conjunction with the mediation, we prepared a position statement submitted to Judge Roberts in order to facilitate the mediation, the drafting and analysis for which had further informed us as to the strengths and weaknesses of our position.  Following upon

the mediation, we conducted post-mediation discovery before signing the final Settlement Agreement in order to confirm various representations about the class and the Disputed Position at issue, which discovery consisted of speaking to our clients, class members, reviewing documents we requested from and were sent to us by BJ's counsel, and interviewing an individual in BJ's Human Resources division regarding duties and responsibilities of Mid-Managers.

11. Further, since the date of the Settlement, we have been involved in negotiating and crafting the preliminary and final approval papers and, as noted, have been called by innumerable class members with questions about the Settlement. Based upon both this experience and upon precedent from other cases we have handled, it can be reasonably anticipated that Class Counsel will hereafter have to spend significant time and effort in the administration and effectualization of the settlement, an effort that will, more than likely add at least 10% more time. There will be scores of telephone calls and correspondence from class members in the coming months wanting to know about the status of the settlement, to ask where their checks are, to inquire why they were not paid (usually because they failed to submit the claims forms or failed to submit them timely), to request reissued checks, etc. There will, in addition, also be time spent overseeing the finalization of the claims process through GCG. All told, an estimation of an additional 10% more time (60 hours plus) certainly can be expected and I believe can most appropriately be considered in approving the fee request.

12. We also believe that we expended our time in a most efficient manner. Work was handled by the attorneys involved in the case primarily by those who had the greatest experience in the relevant areas and time was not wasted by multiple attorneys

assigned to the same tasks.  Where necessary, further, legal assistants and paralegals were employed.  The assignments that were necessary were given to those individuals known to have abilities and expertise in those areas such, as, *e.g.,* researching the matter of damage calculations.  The efforts were always focused on the main goal of obtaining a fair resolution and we undertook to avoid waste, as is evidenced by the manner in which Class Counsel agreed to mediation and requested pre- and post-mediation informal discovery. I believe we prosecuted the litigation efficiently without the need to "re-invent the wheel" in almost any aspect.

13. In connection with the parties' motion for preliminary approval, my prior declaration set out the nature of the arms'-length mediation and negotiation that went into achieving the Settlement.  To repeat that discussion for purposes of final approval, prior to agreeing to a mediation process, we had discussions as to the scope of what would be covered and made it clear that before we could agree to mediation, Plaintiffs would receive information concerning the size and scope of the potential collective and Rule 23 classes, rates of pay and other information that would relate to the merits of the claims. In other words, while we were willing to forego formal discovery and stay the action for a good-faith mediation process, we knew we had to be intelligently informed about the case before any such process could have a chance of success.

14. After BJ's agreed to our parameters for a mediation, in early July, the parties sought, and obtained, from Judge Neimann a stay of proceedings to allow the settlement discussions to proceed.  We thereupon presented a set of specific information that we required and the parties agreed upon a mediator, a former United States Magistrate Judge, the Hon. Kathleen A. Roberts.  Judge Roberts is with JAMS and she

has had extensive experience in mediating similar nationwide wage and hour cases with hybrid allegations pursuant to both state and federal law and is well-respected as an able and experienced mediator of these cases.

15. The parties then voluntarily exchanged the (informal) discovery information each side believed was necessary for the mediation and had a number of conferences and communications preparatory to the mediation itself, both between ourselves and together (as well as separately) with Judge Roberts. We specifically requested certain information about the class size, about pay rates, about the scope of employment and other information, all of which Defendant ultimately provided to Plaintiffs' counsel prior to the mediation. In turn, both sides conducted their own analysis regarding the (1) potential liability if the case were to proceed and (2) relative strengths and weaknesses of the legal merits of their respective positions.

16. Due to the extensive nature of this pre-mediation investigative process, Defendant requested to move the mediation date from August 17th and 18th to October 20th and 21st. Plaintiff agreed and, following this agreement, the parties jointly moved to continue the stay until after the scheduled October 20th and 21st mediation. The Court did not grant this motion, as the previous order granting the stay stated that "there shall be no further extensions," but informed the Parties they could modify the deadline referenced above to complete class discovery. The Parties jointly agreed that the final day to conduct class discovery would be December 18, 2009.

17. We confidently believed, as we went into the mediation process, that we were well informed about the strengths and weaknesses of the case and, based upon our knowledge and experience, that we could meaningfully reach resolution. We had

conducted two sets of prefiling investigations (for the prior case and then this case), had reviewed the information BJ's had provided, and had spoken to all of our clients both in the earlier and present cases to determine their actual job duties and responsibilities and the job duties and responsibilities of the various positions at issue. Our investigation included research into the claims and analysis of the actual duties and responsibilities of the employees who held the positions as issue and the manner in which BJ's had compensated employees who held the positions. In addition we also investigated and analyzed the applicable state and federal law as applied to the facts discovered with regard to the claims asserted and the potential defenses thereto. In conjunction with the mediation, we prepared a position statement submitted to Judge Roberts in order to facilitate the mediation, the drafting and analysis for which had further informed us as to the strengths and weaknesses of our position.

18. As noted, before the mediation, the parties exchanged information and both together with (and separately) discussed the case with Judge Roberts. The mediation took place as scheduled, on October 20 and 21st and, during the course of it the parties went back and forth as to the legal and factual strengths and weaknesses of the case. The process was aided by BJ's having several of its officers and executives present. The mediation included open discussion and debate at mediation between the parties and through the mediator regarding the parties' differing legal positions analyzing the applicable law as applied to BJ's classification of employees holding the various positions as exempt. The claims and likelihood of their success were debated between the parties, and, at the request of the mediator, the two sides made several presentations to each other. Matters addressed included the size and scope of the claims, the likelihood

of success on the merits, the manner in which damages could be calculated and obtained, the likelihood of trial and what would occur at trial.  In addition, during the mediation, we made it clear that in connection with any potential settlement we would require robust notice including multiple mailings and a notice that included the amount that class members would receive, both of which ultimately were included in the notice plan in the Settlement Agreement.

19. Judge Roberts oversaw the discussions and the negotiations and, at the very end of the day on the 21st, an agreement in principle was reached.  There can be little doubt that the settlement was the product of arms' length negotiations by informed counsel for both sides.

20. Following the agreement in principle, the parties then negotiated the terms of the Settlement Agreement now being put forward before the Court.

21. As Plaintiffs' counsel, we are of the opinion that the proposed Settlement is fair, reasonable, and adequate. Further, we believe that the Settlement Agreement is in the best interest of the class in light of all known facts and circumstances, including the significant risks and delays of litigation that are presented by the defenses and potential pre-trial and appellate issues BJ's may assert.  A resolution of this litigation at this early stage – rather than following upon a year or more of discovery, collective and class action briefing, post-certification further discovery, pretrial proceedings and potential trial and the costs attendant upon and likely to be incurred through such activities – most certainly greatly inures to the benefit of the Settlement Classes.  As noted, given our experience, including the Staples trial (discussed below), we believe we particularly well aware of the risks and delays attendant upon such a wage and hour misclassification case.   Not only

are the legal issues often unsettled, in the Staples case, although we obtained a plaintiffs' jury verdict, we had to address (and endure) post-trial motion practice that included, among other things, motions for judgment notwithstanding the verdict, to have the damages reduced pursuant to the "fluctuating work week" basis of calculating overtime, and for decertification of the collective class.  There were seven such motions.  The judgment, as entered, was appealed, and it was only just in the last few weeks, almost a year following the entry of the verdict by the jury, that the case has settled and a proposed settlement is now being presented to the court for preliminary approval.  The proposed Settlement here, being presented to the Court for final approval a little more than a year after the case was filed, is, accordingly, a result well to the benefit of the Class members.

22. The benefit, in both time and expenses to the Class members is underscored by our experience in taking a similar case through to trial (that we were unable to settle pre-trial).  With Ms. Rudich of my office, in January 2009, we were trial counsel at one of the only two FLSA misclassification cases of which we are aware that have ever been tried to a jury, *Stillman v. Staples Inc.*, No. 07-849 (KSH) (PS) (D.N.J.).  Like the present case, *Stillman* involved assistant store managers at a large retail company.  That collective action trial, which, even after an expedited schedule, occurred nearly two years following upon the filing of the case, consumed six weeks of time, cost hundreds of thousands of dollars and presented innumerable contested issues of both law and fact.  In connection with our fee application in that case, plaintiffs' counsel submitted a declarations stating that they had spent of 8,361.39 hours involved in the case and incurred $223,821.94 in out-of-pocket costs.  That was the effort that was required to obtain a judgment (when doubled by the Court under the FLSA) of $4.9 million for the

assistant store managers who had opted-into the case.  (Subsequently, the *Stillman* verdict has been subsumed in a much larger settlement on behalf of all Staples assistant store managers, which settlement is scheduled for final approval in September.)  Obviously, the time and effort involved was substantial just to obtain the favorable jury verdict.  But even after the jury verdict was obtained, the post-trial motion practice that thereupon followed was quite extensive and included, among other things, motions for judgment notwithstanding the verdict, to have the damages reduced pursuant to the "fluctuating work week" basis of calculating overtime and for decertification of the collective class.  Appeals were then filed, which only were withdrawn upon the reaching of the now-pending settlement.  As in *Stillman*, were Plaintiffs here to prevail at trial, as in *Stillman*, any judgment could be appealed, thereby extending the duration of the litigation.

23.     That is why, based upon our experience, we recognized that a fair and reasonable settlement achieved, earlier, rather than later, can aid our clients (the putative collective and Rule 23 classes) by obtaining payment much sooner than what otherwise could be the case.  This was particularly true because, here, value of the Settlement represents a significant proportion of the ultimate value of the claims even if, as in the *Stillman* case, the litigation was tried through to a successful jury verdict.  Although there are numerous ways to extropolate damages (because determining damages requires reaching determinations of such matters as what were the actual hours worked by the Class members) and the parties take differing positions as to what measure of damages would be applicable, using what Class Counsel believe to be a most likely scenario and reasonable litigation result (and the using the same numbers that we obtained from the jury in the *Stillman* case against Staples), the $9.149 million settlement represents nearly

11

70% of the total possible recovery (including liquidated damages) using Plaintiffs' damage measure and would represent an ever higher percentage using the formulation for which BJ's would have argued.

24. As to my firm's experience otherwise with respect to wage and hour and complex litigation, a copy of my firm's resume is attached as Exhibit B hereto.

25. Class Counsel is petitioning an award of $2,470,894 in fees and $11,620.79 in costs and expenses. This represents a fee and cost request of 27% of the settlement fund, an amount we believe to be fair and proper given the results obtained in this case and the other factors that are considered in determining fee requests, as we set forth in our memorandum in support of final approval.[1] We note that this is 10% lower than the potential petition that was set forth in the Notice to the Class, which stated that "Class Counsel will apply to the Court for legal fees and reimbursement of costs of litigation in an amount of no more than thirty percent (30%) of the total settlement amount." *See* Blair Aff. (Exhibit A) at Exhibit A at 4 (of Official Court Notice) to Blair Aff. Not a single objection was received to the 30% figure, which makes, we believe, the 27% that is being requested further and notably reasonable.

26. As to the $11,620.79 being requested for costs, $10,620.79 of that consists of the un-reimbursed expenses incurred to date in connection with the case. The expenses incurred are reflected in the books and records of my firm and constituted the necessary costs of litigating this case, including costs associated with the mediation (over

---

[1] In actuality, and in practical terms, we are petitioning for 26.9% of the common benefit obtained because, here, half of the notice and administration costs of the claims administrator are being paid for by BJ's. Usually, such amounts are entirely paid out of the settlement fund and since those costs are of benefit to the class, they can properly be considered to increase the value of the common benefit to the class, which would add approximately $75,000 to the common benefit fund that was obtained.

12

$7,000), legal research, travel, meals, transportation, court fees, mailing, postage and telephone.  These expenses are documented on the books of my firm.  Any and all of the time and expense records are available for the Court's inspection, should it so require.  Class Counsel also request reimbursement of the incidental costs and expenses to be incurred as a result of appearance at the Final Approval Hearing and such other incidental costs as may accrue prior to the finalization of the Settlement.  Such amounts are reasonably anticipated to be minimal in scope, and certainly not more than $1,000, which is the requested amount.

27.  As to the named Class Representatives and the request for a service bonus of $10,000 for each individual, this request was set out in the Notice that went to the class members. *See* Blair Aff. (Exhibit A) at Exhibit A at 4 (of Official Court Notice).  No objections were received to this request.  From the commencement of the litigation and throughout its course, the Class Representatives provided Class Counsel with aid in formulating the case, providing suggestions as to the scope of the case, the facts concerning liability, and answering questions both prior to and after the mediation process and generally responding to questions and queries from Class Counsel as the case progressed.  Each authorized Class Counsel to enter into the settlement.  In light of their involvement, I believe the requested service bonuses are reasonable.

28.  Based on all of the foregoing and in the event that the Court approves the requested attorneys' fees and costs, the requested payment to the claims administrator and the requested service payments, approximately $6,562,484 will be available for distribution to the class.  This represents a payment, on average, of $2,341.24.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected. Executed on this 11th day of June 2010, in Rye Brook, New York.

                                                                                        _____
                                                                                        Seth R. Lesser